## AFFIDAVIT



DEC 18 2020

Clerk, U. S. District Court
Eastern District of Tennessee

I, Kristopher L. Mynatt, being duly sworn, state the following information to be true to the best of my knowledge, information and belief:

1.       I am a sworn police officer for the Roane County Sheriff's Office in Kingston, Tennessee, and have been so employed since September 1, 2007.  I have previously been employed as a police officer for the City of Harriman, Tennessee, and a Special Agent for the Tennessee Bureau of Investigation.  I have served as a Patrol Officer for over 3 years and as a Narcotics Investigator for over 18 years combined with the Harriman Police Department and Roane County Sheriff's Office Narcotics Units.  I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) and have been so deputized since 2008.  I am currently assigned to the Knoxville Field Office of the FBI and am assigned to the Appalachia High Intensity Drug Trafficking Area (HIDTA) Task Force.  My primary duties and responsibilities involve investigating federal law violations, including the Controlled Substances Act, as found in Title 21 of the United States Code.  During my tenure as an FBI Task Force Officer and Narcotics Investigator, I have investigated numerous crimes, including, but not limited to, illegal narcotics trafficking, gangs and organized crime, money laundering, fugitive violations, and weapons violations. I have received specialized instruction in narcotics enforcement from the Tennessee Bureau of Investigation, the State of Tennessee Law Enforcement Training Academy (TLETA) Advanced Training Seminars, and the Public Agency Training Council.  I have also received specialized training in highway and interstate drug interdiction from the Appalachia HIDTA, Kentucky Motor Vehicle Enforcement, Kentucky State Police, West Virginia State Police, Tennessee Highway Patrol, FBI, and the United States Drug Enforcement Administration

(DEA).  Furthermore, I have kept myself abreast of narcotic enforcement efforts, case development, investigative techniques, and other standardized methods of investigation of narcotics offenses (this list is non-exhaustive, as the amount of training I have received both in the field and in a classroom setting is extensive).  These courses have allowed me to keep abreast of drug enforcement efforts, case development, procedures and practices, general investigative measures, and other standardized investigation methods involving drug offenses.  I have also had the opportunity to develop knowledge of the equipment, tactics, and techniques used in the production, consumption, sale, and distribution of various narcotics.

2.      In the performance of my duties as a uniformed law enforcement officer, TBI Special Agent, narcotics investigator, and FBI TFO, I have conducted and participated in numerous investigations involving narcotics and other general investigations of state and federal laws.  I have been involved in detecting and investigating state and federal drug violations, including the sale, distribution, importation, possession, and conspiracy to possess or sell and distribute various narcotics, controlled substances, and drug paraphernalia.  I have been the affiant in federal Title III wiretap investigations that resulted in multiple defendants' felony convictions for federal drug law violations.  I have participated in numerous Title III investigations as an FBI TFO.  I have utilized and managed numerous confidential sources (CS) during various narcotics investigations.

3.      Further, I have conducted or participated in numerous narcotics investigations at the federal, state, and local levels during my career.   I have been involved with numerous multi-jurisdictional, multi-agency investigations involving the US. Attorney's Office, DEA, FBI, the Bureau of Alcohol, Tobacco, and Firearms (ATF), and numerous other state and local law enforcement agencies.  I participated in multiple investigations where communications intercepts

were used as an investigative tool. As a result, I am familiar with the procedures involved and their effectiveness as an investigative strategy. I am an "Investigative or Law Enforcement Officer" within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code. As a result of this training, prior experience, and by working with other municipal, state, and federal agents, I became familiar with the methods, operations, and schemes commonly employed by individuals involved in the violation of narcotics statutes. I investigated many violations of state and federal narcotics statutes in the Eastern District of Tennessee and elsewhere. As a result, I was successful in arresting and convicting numerous individuals associated with narcotics distribution. I was involved in the execution of numerous search warrants dealing with the detection and investigation of state and federal narcotics violations. I participated in several federal Title III wiretap investigations and prosecutions. As a result of all of these investigations and prosecutions, I became aware of methods and techniques utilized by individuals within the Eastern District of Tennessee and elsewhere to sell and distribute various controlled substances, and with codes, slang terms, and other terminology used to refer to controlled substances by narcotics traffickers within the Eastern District of Tennessee and elsewhere.

4. My training and participation in investigations of drug traffickers and others involved in illegal businesses and activities have given me the knowledge to recognize the methods used by drug traffickers, drug manufacturers, and money launderers to conceal their assets, income, and activities from the government and other third parties. Based on my training and experience, I know the following:

a.     Drug traffickers often place their assets derived from their criminal activities in names of other persons or corporate entities other than their own names.  They use false names and identities to avoid these assets' detection by law enforcement agencies to prevent forfeiture of the same.

b.     Drug dealers own and continue to use such assets derived from criminal activities and exercise dominion and control over this property.  However, it may be titled or recorded in the names of others.

c.     Drug dealers who purchase large amounts of controlled substances must maintain and have access to large amounts of cash to maintain and finance their ongoing narcotics business.

d.     Drug dealers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances.  These records are often found in paper form or are stored on computers or other electronic mediums such as cellular telephones.  These drug dealers commonly "front," or loan on consignment, drugs to their customers who must pay for their drugs from the proceeds of their re-sales.  As a result, the drug dealers must keep records of such transactions where they can have a quick and reliable means to recall the status of such transactions.  These records will often be maintained at a residence or business used by the drug dealer or one of his accomplices.

e.     Drug dealers often hide contraband, proceeds of drug sales, and records of drug transactions in secure locations such as their own residences, places which they control but which are titled in the names of others, residences of others who are participants in or

aiders and abettors of the drug conspiracy, their businesses, and bank safe deposit boxes to conceal them from law enforcement officials.

f.       Drug dealers often conceal in their residences, businesses, and safe deposit boxes large amounts of currency, financial records, precious metals, jewelry, and other items of value, which are proceeds of criminal activities.

g.       Drug dealers commonly use cellular telephones and Wi-Fi enabled devices to communicate with drug customers and drug suppliers. These communications are typically in the form of short message service (SMS) or text messages stored on the phones or Wi-Fi enabled devices until deleted by the owner. Cellular telephones and Wi-Fi enabled devices also store other forms of communication such as emails, digital notes, voice recordings, voicemails, photographs, Internet search histories, GPS histories, etc., all of which are used by drug dealers to communicate with drug customers and sources of supply to facilitate their continued criminal activity.

h.       Drug dealers commonly maintain addresses and telephone numbers in books, papers, computers, cellular telephones, or other electronic storage mediums, which reflect the names, addresses, and telephone numbers of their associates or customers in the drug trafficking organization.

i.       Drug dealers often possess photographs and videos of themselves and their associates, their property, and their drugs, and these photographs and videos are kept in their possession and may be stored on computers, tablets, electronic readers, or other electronic storage mediums such as memory cards, cellular telephones, computer hard disk drives and digital cameras.

j.      Drug dealers commonly have, in their possession or in their residences and businesses, firearms, including handguns, pistols, revolvers, shotguns, machine guns, and other weapons, as well as ammunition for these weapons. These weapons are used to protect and secure their property, drugs, and illegal profits from thieves because drug dealers are often the victims of robberies and "rip-offs" during a drug transaction. Because firearms are in demand by drug dealers, such items are often bartered for drugs. Court decisions in both federal and state courts have long recognized that firearms are relevant and probative as such are tools of the drug trade.

k.      Drug dealers often hide contraband or other evidence of their illegal trade in vehicles, storage units, or other locations located on or near their residences in an attempt to deny ownership if such items are found by law enforcement.

l.      Drug dealers often hide contraband or other evidence of their illegal trade near their residences in barns, sheds, outbuildings, or other semi-outdoor locations so that the items remain accessible to them and so that a degree of deniability can be claimed if the items are found by law enforcement.

m.      Drug dealers utilize applications like Facebook Messenger, What's App, Instagram, Snapchat, Text Now, Skype, and other similar messaging services to communicate with co-conspirators concerning the obtainment and distribution of illegal drugs. These services are accessible through cellular telephones, computers, tablets, and Wi-Fi enabled devices. Drug dealers consider these messaging services more secure than traditional telephone communications, making detection by law enforcement more difficult. The fact that these services can be accessed through multiple devices for the

same account means that even if the drug dealer loses or disposes of a phone they fear is compromised to law enforcement, they can still maintain communication with their sources of supply and customer base.

5.       I am participating in an investigation of a heroin and methamphetamine drug trafficking organization (DTO) and the laundering of drug trafficking proceeds, which is being jointly conducted by agents and task force officers of the FBI and ATF.

6.       Except as noted herein, all of the information contained in this affidavit is either known to me personally, has been told to me by another law enforcement officer, or I have obtained through reading investigative reports prepared by other law enforcement officers. Moreover, this affidavit does not contain all of the information known to me or law enforcement about this investigation.

## PURPOSE OF THE AFFIDAVIT

7.       This affidavit is submitted in support of a search warrant application authorizing the search warrant for the following location:

a.       The bedroom with locked closet located at 210 Little Johnson Valley Road, Kingston, Tennessee (Attachment A), a residence utilized as a drug storage location by BRENT TARTER. Investigators believe that the bedroom with locked closet located at 210 Little Johnson Valley Road, Kingston, Tennessee is an alternate drug storage location for BRENT TARTER and the primary residence of his co-conspirator Leroy Steven Hicks. Investigators believe that Leroy Steven Hicks is witting to the drug trafficking activities of BRENT TARTER and that they utilize 210 Little Johnson Valley Road, Kingston, Tennessee, as a location to conceal methamphetamine.

8.     The items to be searched are described in the following paragraphs and in Attachments A and Attachment B.  As set forth herein, there is probable cause to believe there exists evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), as well as 18 U.S.C. §§ 1956 and 1957 will be found at the premises referenced in paragraph no. 7 above.

9.     The facts provided in this affidavit are also based in part on information provided by law enforcement agents and task force officers with the FBI and other law enforcement agencies, on business records, on other information noted herein, and on my experience and background as an FBI Task Force Officer.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 18 U.S.C. §§ 1956 and 1957 have been committed by BRENT TARTER, DWIGHT TARTER, KATHY TARTER, AMANDA ROBERTS (ROBERTS), Leroy Steven Hicks, and others unknown.  There is also probable cause to search the location described in Attachment A for evidence of these crimes.

## BACKGROUND OF THE INVESTIGATION

11.     On December 4, 2020, an arrest warrant was issued, by complaint, in the EDTN for BRENT TARTER for Conspiracy to Distribute Methamphetamine.  The charges stemmed from a September 2019 incident where BRENT TARTER, and a previously indicted co-conspirator, delivered approximately one-pound of methamphetamine to an ATF undercover agent.  BRENT TARTER has been the target of a continuous FBI investigation where BRENT

TARTER and other co-conspirators distribute methamphetamine in the EDTN. The FBI has conducted multiple controlled drug evidence buys of methamphetamine from BRENT TARTER and others, acting at BRENT TARTER's request, during the summer and fall of 2020.

12. During the ongoing FBI investigation, your affiant discovered that BRENT TARTER uses multiple locations to conduct his illegal drug sales and store drugs to include methamphetamine and heroin. It was also found that BRENT TARTER owned and operated various vehicles, some of which are registered in the name of ROBERTS[1].

13. On December 10, 2020, BRENT TARTER was arrested at the In Town Suites in Knoxville, Tennessee, by agents and TFOs of the FBI and ATF. A 2005 Mercedes Benz[2] was seized at the time of BRENT TARTER's arrest by the FBI from the motel parking lot.

14. On December 11, 2020, BRENT TARTER appeared before Magistrate Judge Bruce Guyton and waived his preliminary hearing. BRENT TARTER was remanded into the United States Marshal Service (USMS) custody and sent to the Laurel County (Kentucky) Detention Center.

15. On December 12, 2020, your affiant obtained access to the Laurel County Detention Center's recorded jail call system and began monitoring BRENT TARTER's communications.

**PROBABLE CAUSE**

16. On December 12, 2020, at approximately 12:59 p.m., BRENT TARTER used a recorded jail phone to talk to ROBERTS on her (865) 406-4066[3] telephone. During the

---

[1] ROBERTS shares a house with BRENT TARTER at 314 Woodlawn Drive, Kingston, Tennessee.
[2] According to Tennessee vehicle registration information the 2005 Mercedes Benz is registered in the name of ROBERTS at 314 Woodlawn Drive, Kingston, Tenness
[3] Laurel County Detention Center records list (865) 406-4066 as the approved number for ROBERTS on BRENT TARTER's telephone profile.

Case 3:20-mj-01196-DCP   Document 2   Filed 12/16/20   Page 9 of 22   PageID #: 13

conversation, ROBERTS told BRENT TARTER that someone named "Chris" had given ROBERTS "800" but that Theresa didn't have shit. ROBERTS also told BRENT TARTER that someone referred to as "Hanky" was willing to pay $4,500.00 for BRENT TARTER's truck. ROBERTS and BRENT TARTER also discussed ROBERTS giving "D" $2,000.00 but spreading it out over several smaller payments.

17.      On December 12, 2020, at approximately 1:07 p.m., BRENT TARTER used a recorded jail phone to talk to ROBERTS on her (865) 406-4066 telephone. During the call, ROBERTS told BRENT TARTER that she attempted to put $7,000.00 in BRENT TARTER's safe at "Kathy's[4]" but that Kathy claimed she had moved the safe to "Chelsi's[5]." ROBERTS further stated that she was trying to get the title for the truck she sold to "Hanky" and put the $4,500.00 for the truck in the safe. ROBERTS stated that Kathy indicated that she would get the safe back from Chelsi's the next morning.

18.      I believe, based on my training, experience, and this investigation, BRENT TARTER and ROBERTS had a contingency plan if BRENT TARTER was ever arrested. Based on these recorded conversations, I believe that ROBERTS was instructed to collect outstanding drug debts owed to BRENT TARTER and sell off certain assets. I believe that ROBERTS was instructed to place these proceeds in a safe that BRENT TARTER maintained at DWIGHT and KATHY TARTER's 118 Holber Road residence and that DWIGHT and KATHY TARTER were knowingly assisting in hiding assets and proceeds of BRENT TARTER's illegal drug trafficking.

---

[4] BRENT TARTER has a brother named DWIGHT "Kojack" TARTER who is married to KATHY TARTER.
[5] DWIGHT TARTER and KATHY TARTER have a daughter named Chelsi Tarter who does not live at the 118 Holber Road residence.

19.     On December 12, 2020, at approximately 3:00 p.m., BRENT TARTER used a recorded jail phone to talk to ROBERTS on her (865) 406-4066 telephone. During the call, ROBERTS told BRENT TARTER that she put $100 on phone cards for BRENT TARTER and $700 on commissary. ROBERTS said she was headed to Kathy's. ROBERTS said that Kathy has BRENT TARTER's stuff back at her house. BRENT TARTER told ROBERTS to give Kathy $100 for Kojack[6]. BRENT TARTER said ROBERTS would get something in the mail about his car[7]. ROBERTS said she has 5000 that she's putting up with the $4500 for the truck. BRENT TARTER said that ROBERTS could give Dante 1000 to shut him up. BRENT TARTER told ROBERTS there should be 10,000 in the safe along with what ROBERTS is putting up for him. ROBERTS said she has 7 to 800. BRENT TARTER told ROBERTS she will have more money coming in. BRENT TARTER told ROBERTS that she has access to all of it if she needs it. BRENT TARTER said ROBERTS will be sitting on 20,000 and to take her time with the other shit. BRENT TARTER said, "I had some shit outside that I was trying to tell you." ROBERTS said, "Yeah, I already know." BRENT TARTER said, "it ain't hard to get to." BRENT TARTER said there is stuff hidden at the 4th parking spot from the pole at the end of the curb at the room. BRENT TARTER told ROBERTS to just run her hand across the dirt, and she can't miss it. BRENT TARTER said it's just barely covered up. BRENT TARTER talked to ROBERTS about selling his motorcycle. BRENT TARTER said he knows (KATHY TARTER) will try to get in his shit and told ROBERTS to give her (KATHY TARTER) $100 and go sit with her to keep things cool.

---

[6] Kojack is the nickname of BRENT TARTER's brother and KATHY TARTER's husband, DWIGHT TARTER. DWIGHT TARTER is currently incarcerated at the Roane County Sheriff's Office Detention Center in Kingston, Tennessee.

[7] BRENT TARTER is referencing the 2005 Mercedes Benz seized by the FBI at the time of his arrest.

20.     Based on the information relayed to ROBERTS by BRENT TARTER in the above-detailed call, I believed that there were drugs hidden in the parking lot of the In Town Suites where BRENT TARTER was arrested.  Upon reviewing the call, I immediately provided the information and the location described by BRENT TARTER to other law enforcement agents.  On December 12, 2020, at approximately 8:30 p.m., agents discovered a plastic bag containing a white powder substance hidden along the curb, as described by BRENT TARTER. The substance appeared to be approximately 12 grams of heroin or cocaine.

21.     I believe, based on my training, experience, and investigation, BRENT TARTER wanted ROBERTS to place money received from the sale of a truck in the safe he maintained at the 118 Holber Road residence DWIGHT and KATHY TARTER. I further believe that BRENT TARTER kept this safe at the 118 Holber Road residence to distance it from his illegal activities if his home was searched by law enforcement.

22.     On December 12, 2020, at approximately 3:35 p.m., KATHY TARTER and DWIGHT TARTER used the Roane County Detention Center video visitation[8] feature to communicate.  During the visit, KATHY TARTER told DWIGHT TARTER that BRENT TARTER was having ROBERTS sell BRENT TARTER's truck and other things.  KATHY TARTER said that she had moved "it" to Chelsi's and that if BRENT TARTER wanted ROBERTS to have BRENT TARTER's stuff that he needed to call "Betty" and tell her what he wants to be done.  KATHY TARTER said that ROBERTS is not family, so KATHY TARTER will not give ROBERTS any of the stuff without Betty's permission.  KATHY TARTER walked into the kitchen area of the residence and said, look at how much ice[9] this machine makes with

---

[8] The Roane County Detention Center utilizes a video visitation system that records the audio and video of both participants.
[9] Ice is a commonly used slang for the crystalline form of methamphetamine.

exaggerated tones and facial expressions. DWIGHT TARTER replied that it was overflowing, but KATHY TARTER never angled her camera to show any ice or the refrigerator. DWIGHT TARTER told KATHY TARTER to have "Reggie" come get all that. KATHY TARTER said that there wasn't anything in her house. DWIGHT TARTER expressed concern that someone may try and break in on KATHY TARTER looking for BRENT TARTER's stuff.

23.    I believe, based on my training, experience, and investigation, KATHY TARTER attempted to use coded phrases to tell DWIGHT TARTER that BRENT TARTER's safe contained a significant amount of methamphetamine (ice). I believe that DWIGHT TARTER wanted KATHY TARTER to have "Reggie" come get the safe with the drugs out of the house. I believe that KATHY TARTER's actions indicate that the safe, money, titles, and drugs were still located at her 118 Holber Road residence. I believe that DWIGHT TARTER picked up on KATHY TARTER's actions and also believes that the safe and its contents are still at the house, which is why he suggested having "Reggie" come "get all that" even after KATHY TARTER said that there was nothing "in" her house. I believe that KATHY TARTER had possession of the drugs and other items, but possibly somewhere on the property outside of the residence.

24.    On December 12, 2020, at approximately 6:24 p.m., BRENT TARTER used a recorded jail phone to talk to ROBERTS on her (865) 406-4066 telephone. ROBERTS said that she went to KATHY TARTER's and KATHY TARTER had some car titles out. ROBERTS asked KATHY TARTER about the title for the truck that Hanky bought, and KATHY TARTER said it was in the safe over at Chelsi's. ROBERTS told KATHY TARTER that she needed to put the money in the safe. ROBERTS asked about the safe and said KATHY TARTER said there was only 7000 in the safe and there was so much "shit" in there that it made her sick. ROBERTS said that the family told her that because she was not married to BRENT TARTER

that she couldn't have his stuff. ROBERTS said that BRENT TARTER would have to call Betty and tell her himself what he wanted to be done with his stuff. BRENT TARTER said that ROBERTS was the only one who has access to his safe and that he had $10,000 in there "and that stuff" along with his car titles. ROBERTS said that she was told that the safe was at Chelsi's and that it was open. BRENT TARTER said he is hurting anyone who has fucked with his shit. ROBERTS gave BRENT TARTER a phone number for Betty of 314-9119. BRENT TARTER said they would have to figure out where to put the safe. BRENT TARTER said the title to the Mustang is at ROBERTS and his house[10]. BRENT TARTER said that KATHY TARTER would get her ass beat if his $10,000 is not in the safe. BRENT TARTER said that other shit is in there, but it is all taped up. BRENT TARTER told ROBERTS that she knows what to do with the stuff in the safe. They discussed which aunt's house (Betty or Alice) to keep the safe at when ROBERTS gets it back from Chelsi/KATHY TARTER. ROBERTS said that the stuff can't go to the aunt's house. BRENT TARTER said he knows and that ROBERTS knows what to do with that and just keep the money in the safe at the aunt's house.

25.     I believe, based on my training, experience, and investigation, ROBERTS, and BRENT TARTER are referring to methamphetamine as the "stuff" and "shit" kept in the safe along with BRENT TARTER's car titles and money. I believe that BRENT TARTER referred to the packaging of the methamphetamine when he said it was "all taped up" because large packages of drugs are commonly taped to help prevent rupture and spilling of the drugs. I believe BRENT TARTER wanted ROBERTS to take possession of the meth and only store money and valuables in the safe once it is moved to Aunt Alice or Aunt Betty's house.

---

[10] Known to law enforcement to be the 314 Woodlawn Drive residence.

26.     On December 12, 2020, at approximately 6:24 p.m., BRENT TARTER used a recorded jail phone to talk to Aunt BETTY on her (865) 314-9119[11] telephone. BRENT TARTER talked about how KATHY TARTER shouldn't have moved the safe to Chelsi's. BRENT TARTER told BETTY to tell KATHY TARTER to give the safe to ROBERTS. BRENT TARTER said there was nothing but money in the safe. BETTY said that KATHY TARTER said that there was other stuff in the safe. BRENT TARTER said that ROBERTS needed to get that out of there and put money in the safe. BRENT TARTER talked about ROBERTS taking the safe to Aunt Alice's to keep it there. BRENT TARTER said that KATHY TARTER had to break into the safe to know that it wasn't just money in the safe. BRENT TARTER said only he and DWIGHT TARTER knew what all was in the safe. BRENT TARTER said that ROBERTS would take the other stuff in the safe and get rid of it and bring more money to put in the safe. BETTY asked BRENT TARTER if he wants ROBERTS to have the safe with everything in it. BRENT TARTER said yes and that it has his titles and money in it and that ROBERTS would take the other stuff from the safe and get rid of it and bring money back to put in the safe. BETTY said she would tell KATHY TARTER what BRENT TARTER wants her to do. BRENT TARTER said he would ask Alice if she will hold the safe with nothing but money and jewelry. BRENT TARTER said ROBERTS is going to put another 5000 in the safe. BETTY said that she doesn't want to be responsible for the safe and money. BETTY said she will keep BRENT TARTER's jewelry but isn't comfortable keeping the safe. BRENT TARTER said he would make DWIGHT TARTER pay the 3000 back that KATHY TARTER took out of the safe. BRENT TARTER said ROBERTS has 9000 to put with the money he has in the safe. BRENT TARTER said that ROBERTS sold BRENT TARTER's

---

[11] The (865) 314-9119 is the number provided to BRENT TARTER by ROBERTS as "Aunt Betty."

truck, and that was some of the money that needed to go in the safe. BRENT TARTER said that the other stuff in the safe is worth $20,000. BETTY said she will hold the safe but doesn't want the key. BETTY reiterated that BRENT TARTER wants them to give everything to ROBERTS. BRENT TARTER said he wanted ROBERTS to have everything.

27.     I believe, based on my training, experience, and investigation, that BRENT TARTER further confirms that the "stuff" in the safe is drugs and specifically methamphetamine. BRENT TARTER told BETTY that the "stuff" was worth $20,000.00. That amount would be consistent with approximately 1.5 pounds or more of crystal methamphetamine based on current drug prices in the EDTN. I believe that BRENT TARTER intended for ROBERTS to take possession of the drugs and sell them. I believe BRENT TARTER wanted to store the safe with BETTY or another family member and only use it to hold his illegal drug proceeds and that ROBERTS will maintain control of the profits. I believe that BETTY would relay BRENT TARTER's wishes to KATHY TARTER and that KATHY TARTER would turn over the safe and its contents to ROBERTS unless law enforcement was allowed to seize the items subsequent to a search of KATHY TARTER's residence.

28.     On December 12, 2020, at approximately 7:16 p.m., BRENT TARTER used a recorded jail phone to talk to ROBERTS on her (865) 406-4066 telephone. During the conversation, BRENT TARTER said he just got off the phone with BETTY and told her to tell KATHY TARTER to give ROBERTS all BRENT TARTER's stuff. BRENT TARTER asked if ROBERTS had seen "D" yet. BRENT TARTER says that ROBERTS can call D. BRENT TARTER says he needs to get Kellog's number to give to ROBERTS. BRENT TARTER said that he needs to get Kellog's number through "Man Man." BRENT TARTER said that ROBERTS needs to get "MJ or NJ's" number from Man Man. BRENT TARTER said he has

been fucking with them and that she can holler at them after she gets rid of the stuff from KATHY TARTER's. BRENT TARTER and ROBERTS discussed where to hide the drugs from KATHY TARTER. They discussed hiding them in the trunk of the "old school" car of BRENT TARTER's. BRENT TARTER said that ROBERTS would need to get another safe to keep at BETTY's with money, jewelry, and car titles. ROBERTS said she has $12,000 to put with BRENT TARTER's money. BRENT TARTER said BETTY just didn't want any drugs stored at her house.

29.    I believe, based on my training, experience, and investigation, that BRENT TARTER instructed ROBERTS to get in touch with his source of supply (Kellog and MJ/NJ) and to use them to resupply drugs that ROBERTS can sell. I believe BRENT TARTER and ROBERTS made plans to hide the methamphetamine from KATHY TARTER in one of BRENT TARTER's other cars. I believe BRENT TARTER instructed ROBERTS to buy a new safe because BRENT TARTER thinks that KATHY TARTER broke into the safe at her residence.

30.    On December 13, 2020, at approximately 1:51 p.m., BRENT TARTER used a recorded jail phone to talk to ROBERTS on her (865) 406-4066 telephone. ROBERTS said that she is supposed to get the safe from BETTY at 4:00. ROBERTS said that BETTY doesn't want anyone to know that she has the safe. ROBERTS said that BETTY would have the safe at 4:00. ROBERTS said that she is going to buy a new safe and go by Steve's. BRENT TARTER asked why she was going by Steve's, and ROBERTS said to get it ready for after she meets BETTY she could put it there. ROBERTS said that she will go by and make sure the key BRENT TARTER gave her will unlock the room at Steve's. ROBERTS said that she wanted to make sure everything was right so she could go by there, make Steve right, lock it up in the room, and be gone. ROBERTS said that Hanky already had the truck parked at his house. BRENT

TARTER asked if BETTY was going to get "that" from Chelsi. ROBERTS said she was getting all of BRENT TARTER's jewelry and titles together before meeting with BETTY. BRENT TARTER asked about ROBERTS buying a new safe. ROBERTS said she was going to get a new one at Walmart. ROBERTS and BRENT TARTER talked about things moving slow. BRENT TARTER asked if people had her number. She said they did. BRENT TARTER told ROBERTS to keep 1000 back at the house, and he would tell her why later.

31.     Steve is believed to Leroy Steven Hicks. During the course of the investigation two controlled drug evidence buys were made from BRENT TARTER at Steven Hicks's 210 Little Johnson Valley Road, Kingston, Tennessee residence. BRENT TARTER maintained a bedroom at the residence where he stored methamphetamine and heroin. A CHS utilized a covert video recording device during the controlled drug evidence buys from BRENT TARTER at the Little Johnson Valley road residence. The videos appear to show BRENT TARTER obtaining a bag of methamphetamine from a locked closet in a bedroom in the residence. BRENT TARTER then provided some of the methamphetamine to the CHS which was turned over to law enforcement.

32.     I believe, based on my training, experience, and investigation, that BRENT TARTER and ROBERTS discussed getting the safe and contents from BETTY. I believe that BETTY would maintain the safe at her residence with BRENT TARTER's drug proceeds, jewelry, and car titles. I believe that ROBERTS would take the methamphetamine from the safe and store it at Steve's residence, where BRENT TARTER maintained a locked room.

33.     During this investigation, agents have used covert pole cams to assist in the surveillance of multiple residences used by BRENT TARTER and other co-conspirators to

include the residence located at 210 Little Johnson Valley Road, Kingston, Tennessee. Agents reviewed the recorded footage and observed a black Mercedes[12] arrive on December 13, 2020, at approximately 3:13 p.m. The Mercedes parked near the trailer residence and was approached by two individuals who were outside. The camera malfunctioned at approximately 3:16 p.m., and the video feed was lost. The video resumed at approximately 3:34 p.m. The black Mercedes was no longer at the residence once the video resumed.

34.     I believe, based on my training, experience, and investigation, that ROBERTS drove the black Mercedes and that she came to the 210 Little Johnson Valley Road residence to make sure her key would unlock BRENT TARTER's room. I believe that ROBERTS intended to store BRENT TARTER's methamphetamine in the bedroom with the locked closet at 210 Little Johnson Valley Road, Kingston, Tennessee, a residence once obtained from BETTY.

35.     On December 14, 2020, at approximately 10:16 a.m., BRENT TARTER received a text message from ROBERTS on the Laurel County Detention Center messaging service. The message stated the following:

It was a long day but i got alot done. Amanda M turned ur phone off saturday night. Betty can tell u about kathy. She said she didnt want to give her ur things she had to ho out there and tell her she dent care what ko said u said to bring ur things to me. There was no bix container in there only a bag. There was only 14 but i put them in 2 which is 7. Ur aunt seen it and she did take 3 out but i counted the 7. I put it up safe and went to sell ur truck to Hanky i got the money but ur aunt didnt answer the phone so when i go see her in a few u have 18 with Betty i kept 1 and i

---

[12] Agents have observed ROBERTS operating a black Mercedes Benz with Tennessee license plate 0-VO-718 numerous times during the investigation. The license plate is registered to BRENT TARTER at 314 Woodlawn Drive, Kingston, Tennessee.

have 750 for bills. How much does chelsey owe on that car u got her. Be sure to call her and tell her to pay me the money. Both ur brothers Kathy and Chelsey better get right with God. The silver car battery was dead so i have to go back today to get it. Bertha is helping me get it. Ashley called me last night and told me she sent them to her aunts so i just got off the phone wit her and im going to get them and

35.     I believe that based on my training, experience, and investigation, ROBERTS met with BETTY, obtained the methamphetamine, and gave BETTY a new safe. I believe that the methamphetamine weighed out to 14 ounces and that ROBERTS divided it into two (2) 7-ounce packages. I believe that ROBERTS took or will take the methamphetamine to the 210 Little Johnson Valley Road residence and locked it in BRENT TARTER's room as they discussed. I believe that the "7" that ROBERTS counted was $7,000.00 that KATHY TARTER said was in the safe. I believe that ROBERTS intends to take the money from the truck to BETTY to put with BRENT TARTER's other money, and that will make the total that BETTY is holding $18,000.00.

36.     On December 15, 2020, I reviewed pole cam footage of the 210 Little Johnson Valley Road, Kingston, Tennessee residence. On December 14, 2020, at approximately 1:36 p.m., a black Mercedes Benz sedan arrived at the residence. A female subject with a similar build and hairstyle of ROBERTS exited the vehicle and entered the residence. At approximately 1:41 p.m., the same female subject and a white male exited the residence and appeared to retrieve something from the Mercedes Benz. The female and male went back inside the trailer residence. At approximately 1:50 p.m., the female subject exited the residence and drove away in the black Mercedes Benz sedan.

37.     I believe that based on my training, experience, and investigation, ROBERTS took the 14-ounces of methamphetamine that she obtained from BETTY and put it in the bedroom maintained by BRENT TARTER at the 210 Little Johnson Valley Road, Kingston, Tennessee, residence.

## **CONCLUSION**

38.     Based on the foregoing, I request that the Court issue the proposed search warrant.  Additionally, I request that the court allow law enforcement officers to execute this search warrant on the bedroom and locked closet of the residence located at 210 Little Johnson Valley Road, Harriman, Tennessee, at any time of day or night that is deemed advantageous for the seizure of evidence and/or capture of suspects in the commission of the aforementioned offenses.

## REQUEST FOR SEALING

39.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.


FURTHER AFFIANT SAYETH NAUGHT.

Executed this 16th day of December _____, 2020, in Knoxville, Tennessee,
located within the Eastern District of Tennessee.


Kris L. Mynatt
Task Force Officer
Federal Bureau of Investigation


Subscribed and sworn to before me on December 16, 2020


HON. DEBRA C. POPLIN
UNITED STATES MAGISTRATE JUDGE